```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
UNI-RTY CORP., ET AL.,

                         Plaintiff(s),

   - against -                             95 Civ. 9432 (JES)

                                           MEMORANDUM OPINION
                                               AND ORDER
GUANGDONG BUILDING, INC., ET AL.,

                         Defendant(s).
----------------------------------------x
```
**SPRIZZO, D. J.:**

The above-captioned action arises out of the ownership of the Golden Pacific Building, located in the heart of New York City's Chinatown.  Plaintiffs, Uni-Rty Corp. ("Uni-Rty") and Golden Plaza Limited Partnership ("GPLP"), bring this action, pursuant to the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961.  Following a January 2004 jury verdict for plaintiffs, the Court, in a Summary Order dated December 22, 2004, set aside the verdict, ordered a new trial, and denied defendants' Motion for Judgment as a Matter of Law.[1] The primary issue before the Court is whether defendants proximately caused the plaintiffs' alleged injuries. Defendants Guangdong Building Inc.,("GBI"), New York Guangdong Finance Inc. ("NYGF"), The Hong Kong Shanghai Banking Corp., ("HSBC"), Eastbank, N.A., Joseph Chu, and Alexander Chu (collectively "defendants"), bring this Motion for Summary Judgment pursuant to

---

[1] The Court noted in particular Theresa Shieh's trial testimony on defendants' alleged lease interference which the jury could have found supported plaintiffs' argument that their inability to comply with the sale-leaseback agreement was seriously impaired by defendants' conduct.  However, the Court concluded that the jury's verdict finding that plaintiffs had proven by a preponderance of the evidence that defendants' conduct proximately caused injury to plaintiffs' property was against the weight of the evidence.  The Court noted that while Shieh's testimony may have provided some slight evidence, that testimony was clearly outweighed by the evidence showing that plaintiff could not have complied with the sale-leaseback agreement.  The Court was not at that time convinced that it was sufficient as a matter of law to sustain a rational jury verdict in plaintiff's favor.  Therefore, the Court ordered a new trial.

Rule 56(c) of the Federal Rules of Civil Procedure.  For the reasons that follow, defendants' Motion for Summary Judgment is granted in part and denied in part.

## BACKGROUND

The dispute between the parties in this action centers around the ownership of the Golden Pacific Building (the "building").  In February 1990, plaintiffs borrowed $10 million from defendants to refinance the building and, in return, plaintiffs gave two mortgages to defendants. See Aff. of Daniel J. O'Connell, dated April 22, 2005 ("O'Connell Aff."), Ex. 3 ("Trial Tr.") at 103-04, 107.  Under the loan documents, plaintiffs were required to pay all real estate taxes due on the building and to make interest-only payments each month. See id. at 109, 171; O'Connell Aff., Ex. 6 DX BB ("Ex. 6 DX BB") at CT 0575, Ex. 6 DX CC ("Ex. 6 DX CC") at D 00980, Ex. 6 DX DD ("Ex. 6 DX DD") at EB 0085, Ex. 6 DX EE, Rider to Mortgage ("Ex. 6 DX EE") at EB 0090-91.  The full principal balance of the 1990 loans was set to balloon in four years, in February 1994. See Trial Tr. at 178.  Foreclosure of the mortgages was designated as a remedy for default. See Ex. 6 DX BB at CT 0600, Ex. 6 DX EE at EB 0088.

In 1990, the building was appraised at $14 million, but was still encumbered with $10 million in mortgage debt. See O'Connell Aff., Ex. 5 JSX 46 at JL 00365, Trial Tr. at 178.  As of January 1, 1994, Uni-Rty and GPLP were in arrears in their required payments under the 1990 loan documents. See id. at 177.  Uni-Rty and GPLP owed more than $1,200,000 in back interest and related charges to defendants and an additional $1,400,000 in unpaid real estate taxes on the building. See id. at 176-77.  By early 1994, the unpaid amounts, including

delinquent interest and real estate taxes, totaled approximately $2,600,000. See id. at 177-78.

The $10 million principal balance was due to mature in February 1994, and the full amount was to be paid at that time. See id. at 178. Therefore, in addition to the outstanding $2,600,000 in defaults, plaintiffs had to produce an additional $10 million to satisfy the 1990 loan. Plaintiffs' financial position was further exacerbated by the real estate market collapse in the early 1990's that caused the value of the building to plummet to $7.7 million. See O'Connell Aff., Ex. 5 JSX 47 at JL 00004. Since plaintiffs had insufficient revenues and either did not or could not locate alternative financing, plaintiffs defaulted on their 1990 loan agreement. See Trial Tr. at 177-81.

Because plaintiffs were in default and had lined up no alternative source of financing, in late 1993 and early 1994, Chuang, the founder of Golden Pacific National Bank and a prominent figure in New York's Chinese-American community, and Joseph Chu negotiated what was referred to at trial as the "1994 Transaction." See id. at 205, O'Connell Aff., Ex. 5 JSX 1; O'Connell Aff., Ex. 1 ¶ 13. The 1994 Transaction included a sale and leaseback with a repurchase option and an additional $3 million in loans from Joseph Chu to the plaintiffs. See Defs.' Statement Pursuant to Local Civil Rule 56.1(a) ("Defs.' Statement") ¶ 34; O'Connell Aff., Ex. 5 JSX 1-5. Uni-Rty and GPLP deeded the building to GBI, a company formed by Joseph Chu to hold title to the building. In exchange, GBI assumed liability on plaintiffs' $10 million mortgage to NYGF, thereby cancelling plaintiffs' liability on that debt and Chuang's personal guaranty. See Trial Tr. at 135, Defs.' Statement ¶ 36.

GBI leased the building back to the plaintiffs for a period of two years with no renewal right. See Trial Tr. at 169,

3

O'Connell Aff., Ex. 5 JSX 2 ("Ex. 5 JSX 2") at D 01442.  The $3 million loan from Joseph Chu as part of the sale and leaseback transaction provided plaintiffs with funds to pay their delinquent real estate taxes and interest arrears and left them with an additional $316,000 in working capital. See Defs.' Statement ¶ 41.  Plaintiffs also negotiated for and received an option to purchase the building during that two-year period as long as they were not in default. See Trial Tr. at 205.  In order to exercise the repurchase option, plaintiffs would be required to pay a $10 million purchase price, plus repay the $3 million loan from Joseph Chu and the deferred interest and lease payments. See Trial Tr. at 205, Ex. 5 JSX 2 at D 01464.  Therefore, assuming the full amount of deferred rent ($1 million) and the full amount of deferred interest ($300,000), plaintiffs would be required to produce $14.3 million dollars in order to exercise their repurchase option. See Trial Tr. at 262.

   Plaintiffs failed to pay their property taxes in January 1995 and their lease payments for May, June, and July 1995.  As of mid-July 1995, plaintiffs' defaults amounted to $216,588.77, excluding the real property tax payment due in July 1995, which they also failed to pay. See id. at 369-70.  Those non-payments constituted a default under their lease.  A default notice, outlining those defaults, was sent to the plaintiffs. See id. at 259.  Plaintiffs failed to cure these defaults.  Plaintiffs did not dispute that GBI had the legal right to evict plaintiffs from the building as a result of those defaults. See id. at 265.

    The evidence at trial established that plaintiffs lacked the financial resources they needed to cure their defaults or to exercise their option to repurchase the building.  The plaintiffs offered no proof as to how they could raise the

approximately $14.3 million they needed in order to exercise their repurchase option. See id. at 179-81.

The Court held a trial on the issue of causation in January 2004. The jury returned a verdict in favor of plaintiffs. The Court vacated this verdict in a December 22, 2004 Summary Order finding that defendants had presented at trial voluminous evidence that plaintiffs did not have the financial resources to keep the building.

As noted above, the Court ordered a new trial based on certain claims of "lease interference" made by plaintiffs at trial. The Court permitted post-trial discovery to last until April 2005. The Court permitted defendants to file a Motion for Summary Judgment on April 22, 2005 and heard Oral Argument on June 21, 2005.

## DISCUSSION

A court may only grant summary judgment when "there is no genuine issue as to any material fact" and a party is "entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Although the movant bears the initial burden of showing that there are no genuine issues of material fact, once such a showing is made, the party opposing a properly supported motion must "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, 477 U.S. 242, 256 (1986). To establish a genuine issue of fact, the party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts;" it must come forward with "specific facts showing that there is a *genuine issue for trial*." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)(quoting Fed. R. Civ. P. 56(e)). Absent such a showing, summary judgment is appropriate

5

since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

Despite the broad language of the civil action provisions of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1964(c), Supreme Court precedent makes clear that Congress intended to limit standing in civil actions under this provision to those plaintiffs who can establish the common law requisite of proximate cause. Anza v. Ideal Steel Supply Corp., 126 S.Ct. 1991, 1994 (2006), Holmes v. Sec. Investor Protection Corp., 503 U.S. 258, 267, 279-80, 286 (1992); Associated Gen. Contractors of Cal., Inc v. Cal. State Council of Carpenters, 459 U.S. 519, 535-36 (1983) (discussing the proximate cause requirement in the Clayton Act, after which this RICO standing provision is modeled); Blue Shield of Va. v. McCready, 457 U.S. 465, 476-78, (1982) (discussing proximate cause requirement in Clayton Act). By itself, "but for" causation is not sufficient. First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 769 (2d Cir. 1994). Rather, plaintiffs must show that defendant's "RICO violation was [a] . . . cause-in-fact of his injury, [as well as] . . . the legal or proximate cause." Id. Plaintiffs' failure of proof concerning this essential element requires that this Court grant summary judgment.

To establish proximate cause, a plaintiff must show an adequate nexus between the alleged violation and the alleged harm to the plaintiff. The Second Circuit has elaborated on this requirement, noting that RICO predicate acts "proximately cause a plaintiff's injury if they are a substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." Hecht v. Commerce Clearing House Inc., 897 F.2d 21, 23-24 (2d

6

Cir. 1990). The Supreme Court's June 2006 decision in Anza, 126 S.Ct. 1991, further defines the RICO proximate cause analysis, holding that an injury that derives from harm suffered by another is insufficient. Id. at 1998. In that case, because plaintiff's lost sales could have resulted from factors other than petitioners' alleged acts of fraud, plaintiff's injury was found to be too attenuated from defendant's alleged conduct, and, as a result, plaintiff failed to establish proximate cause. See id. at 1992.

Plaintiffs in the present case fail to satisfy the nexus requirement of proximate cause - they have not traced the alleged RICO violation to the injury. See Anza, 126 S.Ct. at 1997. Voluminous evidence exists, including Mr. Chuang's own judicial admission, establishing that plaintiffs did not have the financial resources to keep the building and that they would have lost the building regardless of defendant's conduct. Plaintiffs do not dispute that, during the sale and leaseback period, they had only a fraction of the financial resources necessary to cure their substantial defaults or the $14.3 million they needed to repurchase the building. Plaintiffs' own documentary evidence shows that they had a gross income of $1,098,142.69 during the period January 1, 1994 through November 30, 1995. Defs.' Statement ¶¶ 56-59.

At trial in January 2004, and later at Oral Argument in June 2005 on this Motion for Summary Judgment, plaintiffs contended that defendants interfered with an imminent transaction between plaintiffs and Off Track Betting ("OTB") which would have raised the necessary cash flow to repurchase the building or secure financing. The evidence offered by plaintiffs, however, cannot support this inference. At most, plaintiffs have shown that preliminary discussions with OTB had commenced. See Trial Tr. at 339-42, Tr. dated June 21, 2005 ("June Tr.") at 25-29. Even if

7

the discussed transaction had come to fruition, plaintiffs have not shown that the transaction would have provided ample capital to repurchase the building. Plaintiffs' argument that the completed OTB transaction would have lead to alternative financing is even more conjectural. Such metaphysical leaps and highly unlikely "what-ifs" are not sufficient to overcome summary judgment. Matsushita, 475 U.S. at 586-587.

Notwithstanding the Court's previous view that Theresa Shieh's testimony provided some slight evidence of proximate cause, in view of RICO's established standard for proximate cause, the Court concludes that, even giving plaintiffs the benefit of every rational inference derived from Sheih's testimony, there is still insufficient evidence to overcome this Motion for Summary Judgment. Plaintiff's "loss" occurred for no reason other than plaintiffs' own inability to generate the cash flow needed to meet their obligations under the sale and leaseback transaction. There is no material factual dispute that plaintiffs lost the building because of their inability--independent of any act or omission by the defendants--to satisfy their financial obligations under the 1994 sale leaseback agreement. Therefore the instant motion is granted as to the claim under RICO.

As to defendant's lease interference claims, summary judgment is denied, as there is competent evidence that the defendant improperly interfered with plaintiff's leases.

## CONCLUSION

For the reasons stated above, defendants' motion for summary judgment shall be and hereby is granted in part and denied in part. Plaintiff's cross-motion for summary judgment is denied. A Pre-Trial Conference, at which the Court will set a date for

trial on damages, shall occur on December 12, 2006 at 3 p.m. in Courtroom 21C, 500 Pearl Street.

**It is SO ORDERED.**

DATED: New York, New York
November 30, 2006

_____
John E. Sprizzo
United States District Judge

**APPEARANCES**

GREENBERG TRAURIG, P.A.
Attorneys for Plaintiffs Uni-Rty Corp.
and Golden Plaza Limited Partnership
450 South Orange Avenue
Suite 650
Orlando, FL 32801

    GREGORY W. HERBERT, ESQ.

        Of Counsel

PAUL A. BATISTA, ESQ.
Attorney for Plaintiffs Uni-Rty Corp.
and Golden Plaza Limited Partnership
26 Broadway
New York, NY 10004

BROOKS & ASSOCIATES, LLP
Attorneys for Defendants Guangdong
Building Inc., New York Guangdong
Finance, Inc., Eastbank, N.A.,
Joseph Chu, and Alexander Chu
1206 Pacific Street, Suite 1a
Brooklyn, NY 11216

    MARNI ELYSE WEISS, ESQ.
    DANIEL JOSEPH O'CONNELL, ESQ.
    JOHN CHARLES OHMAN, ESQ.
    RAFAEL JOHN DROZ, ESQ.

        Of Counsel

MAYER, BROWN, ROWE & MAW, LLP
Attorneys for Defendants Guangdong
Building, Inc., New York Guangdong
Finance, Inc., The Hong Kong
Shanghai Banking Corp., Ltd., Eastbank,
N.A., Joseph Chu, and Alex Chu
1675 Broadway
New York, NY 10019

    MICHAEL O. WARE, ESQ.
    RICHARD A. SPEHR, ESQ.

        Of Counsel